**In the Matter of ADVANCE GLOVE MANUFACTURING CO., a Michigan corporation, Debtor.**

**G.E. GROGAN, Trustee for Advance Glove Manufacturing Co., Plaintiff,**

**v.**

**SOUTHWEST TEXTILES, INC., Defendant.**

**Bankruptcy No. 81–01572–B. Adv. No. 83–0472–B.**

United States Bankruptcy Court, E.D. Michigan, S.D.

Aug. 22, 1984.

Jaffe, Snider, Raitt & Heuer, P.C. by Jay L. Welford, Detroit, Mich., for trustee.

Donovan, Hammond, Ziegelman, Roach & Sotiroff, P.C. by Thomas E. Reiss, Detroit, Mich., for defendant.

## OPINION

GEORGE BRODY, Bankruptcy Judge.

This is an action by the trustee to recover alleged preferential payments of $145,-160.50.

On March 19, 1981, Advanced Glove Manufacturing Company (debtor) filed a petition under chapter 11 of the Bankruptcy Code. On November 30, 1981, the case was converted to chapter 7 and a trustee appointed. Within ninety days of the filing of the petition in bankruptcy, the debtor paid a creditor, Southwest Textiles, Inc. (Southwest) approximately $328,700. After the case was converted, the trustee filed an action alleging that the payments, to the extent of $145,160.50, were preferential and therefore recoverable pursuant to section 547(b).

Section 547(b) of the Code permits a trustee to avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;

. . . .

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

[The purpose of the preference provision is to] facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others

of his class is required to disgorge so that all may share equally. The operation of the preference section to deter "the race of diligence" of creditors to dismember the debtor before bankruptcy furthers the goal of the preference section—that of equality of distribution.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 178 (1977), *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 6138.

The trustee, to prevail in a preference action, must establish all elements set forth in section 547(b). Southwest contends that the trustee has not done so. More particularly, Southwest contends that the trustee has not established that the payments received by it were more than it will receive in the chapter 7 liquidation. This argument has no merit. The evidence clearly establishes that the expected distribution to unsecured creditors of the estate will be no more than 70% and perhaps as low as 37%. A transfer is preferential if the payment enables the creditor to "receive more than such creditor would receive" upon liquidation in a chapter 7 proceeding. If Southwest were permitted to retain the payments received, it would receive 100% with respect to such debts, whereas other creditors of the same class would receive materially less. A payment which enables a creditor to obtain a greater percentage of his debt than he would receive in a chapter 7 proceeding if the transfer had not been made is a preference and therefore recoverable by the trustee.

Southwest additionally maintains that possibly, due to factors not now known, the estate could be enlarged to permit a 100% distribution to all creditors. To accept this argument "would make it impossible for a Trustee to recover any transfer as a preference." *Belfance v. Bancohio/National Bank (In re Gastaldo)*, 13 B.R. 808, 810 (Bankr. N.D. Ohio 1981). Moreover, even if additional assets were recovered, Southwest would not be prejudiced, since they would be able to share pro rata in the dividends received with other creditors of the same class. *In re Gastaldo; Brent Explorations, Inc. v. Karst Enterprises, Inc. (In re Brent Explorations, Inc.)*, 31 B.R. 745 (Bankr. D. Colo. 1983).

Southwest contends that the transfers were not preferential for an additional reason. This argument can be summarized as follows:

1) When the bankruptcy petition was filed, the debtor still owed Southwest $125,359.22;

2) If the payments attacked by the trustee had not been made, its claim would have been $270,519.72 [$125,-359.22 plus $145,160.50];

3) The payments which the trustee seeks to recover constituted 53.569% of its total claim; [1]

4) Creditors will receive at least that percentage of their claims from the estate as distribution;

5) The transfer, therefore, is not preferential.

Section 547(b) cannot be so read. Section 547(b) provides that a trustee may avoid a transfer of property if the transfer enables the creditor to receive more in payment of the debt than the creditor would receive in payment "of such debt" in a chapter 7 liquidation. The debt referred to is the total debt or any portion thereof which was actually paid to the creditor. The term "such debt" does not include any unpaid portion of the obligation, whether existing at the time of payment or subsequently incurred. The comparison to be made is between what the creditor received in payment of such a debt which has been satisfied and what other creditors of the same class will receive in payment of their debts. The following example removes any doubt as to how the computation is to be made.

The payment on account of say 10 per cent within the four months will necessarily result in such creditor receiving a greater percentage than other creditors, if the distribution in bankruptcy is less than 100 per cent. For where the creditor's claim is $10,000, the payment on

---

**1.** Actually, there is no evidence to establish that the distribution to creditors will be 53.569%.

account $1,000, and the distribution in bankruptcy 50 per cent, the creditor to whom the payment on account is made receives $5,500, while another creditor to whom the same amount was owing, and no payment on account was made, will receive only $5,000. A payment which enables the creditor "to obtain a greater percentage of his debt than any other of such creditors of the same class" is a preference.

*Palmer Clay Products Co. v. Brown,* 297 U.S. 227, 229, 56 S.Ct. 450, 451, 80 L.Ed. 655 (1936).[2] *See also, 2 Norton Bankruptcy Law & Practice* ¶ 32.09 at 27 (1981).

Alternatively, Southwest has raised three additional defenses to the trustee's action. They are as follows:

1) The payments are not recoverable because they fall within the ordinary course of business exception of section 547(c)(2) which protects a transfer to the extent that the transfer was:

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms;

11 U.S.C. § 547(c)(2).

2) The payments are not recoverable because they were contemporaneous exchanges for new value and, therefore, are protected by section 547(c)(1) which provides that a transfer is not avoidable by the trustee to the extent that such transfer was:

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

§ 547(c)(1).

3) Any payments made in excess of what was intended to be a contemporaneous exchange were payments for goods to be delivered in the future and, therefore, they do not constitute preferences as defined in section 547(b) because they were not payments for antecedent debts.

 Section 547(c) contains six defenses to a preference action. A payment is insulated from preferential attack if the creditor establishes that he comes within any of these exceptions. "If a creditor can qualify under any one of the exceptions, then he is protected to that extent. If he can qualify under several, he is protected by each to the extent that he can qualify under each." H.R. Rep. No. 595, 95th Cong. 1st Sess. 373 (1977); S.Rep. No. 989, 95th Cong. 2d Sess. 88 (1978), U.S. Code Cong. & Admin. News 1978, 5874, 6329. However, the section 547(c)(1) and (c)(2) exceptions are mutually exclusive, and the facts with respect to a particular payment dictate which exception, if either, is applicable.

Southwest Textiles, Inc. is a manufacturer of yarn located in Abernathy, Texas. Southwest had shipped yarn to the debtor on open account from November 1975 until early in 1980, when it became concerned

---

**2.** Section 547(b) is derived from section 60a of the Bankruptcy Act. Under section 60a, a transfer was a preference if the effect of that transfer was to enable the creditor "to obtain a greater percentage of his debt than some other creditor of the same class." § 60a(1), 11 U.S.C. § 96a(1). Section 547(b) omits reference to "some other creditor of the same class" to make it clear that "the court must focus on the relative distribution between classes as well as the amount that will be received by members of the class of which the creditor is a member." H.R. Rep. No. 595, 95th Cong., 1st Sess. 372 (1977), U.S. Code Cong. & Admin. News 1978, 6328. The language contained in section 60a would conceivably permit preferring a junior class over a senior class. For example, under section 60a, a tax claimant who received a payment that was otherwise preferential could, if he were the only tax claimant, argue that the payment to him was not preferential since he did not receive more than any creditor of the same class even though there were existing priority wage claims senior to the tax claim. *See* 11 U.S.C. §§ 724(b), 507. The change in language, by focusing on the creditor's improvement of his individual position rather than on his comparative position with others in his class, obviates this possibility.

about the size of the debtor's unpaid account. The debtor wanted to continue in business and to attempt to work out its financial problems. The debtor called Southwest, explained its financial problems, and advised Southwest that it wanted to continue buying yarn and would attempt to "reduce ... existing indebtedness on a fairly regular basis." Record at 59. The debtor was a valued customer and Southwest was amenable to continue shipping yarn to the debtor to enable the debtor to operate if it could be assured of payment for current shipments and if the payments were also made on the existing indebtedness. To accomplish these objectives, the debtor and Southwest entered into an arrangement whereby it was agreed that the debtor, when he needed yarn, would call Southwest and inform Southwest of the amount of funds that it had available to pay for yarn. Southwest would then ship the yarn with a value approximating the funds that the debtor agreed to transmit. The number of pounds of yarn actually shipped varied depending upon the size of the truck Southwest was able to hire to transport the yarn and the manner in which the truck was loaded. The yarn shipped, therefore, did not always correspond to the amount of money forwarded by the debtor. In most cases, the payments exceeded the value of the yarn shipped. The overpayments totalled approximately $107,000.

Prior to the arrangement worked out between Southwest and the debtor, when Southwest received a payment from the debtor for yarn which Southwest had delivered, a deposit slip was filled out with a notation indicating an invoice number to which the payment was to be applied, and Southwest's bookkeeper would mark "pd" next to the corresponding invoice number on the ledger. This procedure was changed with respect to shipments made after the agreement entered into between Southwest and the debtor. After the plan agreed upon went into effect, the debtor's ledger sheets reflect only a running balance without identification of any particular payment to any particular invoice. As checks were received, the bookkeeper reflected the amounts received as credits on

the debtor's account and subtracted that amount from the then-existing balance. Based upon the foregoing summary of the record, the court concludes as follows:

### 1. The Section 547(c)(2) Exception

Southwest has not established that any of the payments came within the section 547(c)(2) exception. The record is devoid of any evidence to establish that any of the payments were made within forty-five days after a debt was incurred.

### 2. The Section 547(c)(1) Exception

The evidence establishes, however, that Southwest and the debtor intended that payments made by the debtor for goods shipped, to the extent goods of the same value were actually shipped, were intended to constitute contemporaneous exchanges and in fact were so treated. Such payments, therefore, are insulated from attack by virtue of section 547(c)(1). The trustee's contention that Southwest has failed to establish that the transfers were contemporaneous exchanges for new value because the books and records of Southwest do not identify a particular payment with a particular invoice is without merit. The agreement of the parties that yarn was to be shipped when the debtor had funds available to pay for them and the dates of payment and shipment clearly establish that the transfers were intended to be contemporaneous exchanges for new value and that the transfers were in fact substantially contemporaneous exchanges for new value. The fact that Southwest did not allocate a payment to an identifiable shipment is therefore not fatal to its section 547(c)(1) defense. *People v. Vandenburg Electric Company,* 343 Mich. 87, 72 N.W.2d 216 (1955).

### 3. Section 547(b) Prepayment Defense

Southwest's payments, to the extent that they exceeded the value of a shipment, were not payments for goods to be delivered in the future. Any overpayment with respect to any shipment was intended to be applied to the existing debt of the debtor, and was in fact so applied. The testimony of the president and general manager of

Southwest that any overpayment was to be applied to future shipments was a self-serving afterthought and finds no support in the record. The record, in its totality, clearly establishes that Southwest agreed to ship merchandise to the debtor only after the debtor called and advised Southwest as to the amount of funds available for payment of a particular shipment. No evidence indicates that any shipment was in fact made without Southwest first receiving a call from the debtor. In fact, all of the payments received, as previously noted, were immediately posted as a credit to the then-existing balance. This treatment of any funds received in excess of the value of the goods shipped was consistent with the intent of the parties "to reduce some of the existing indebtedness on a fairly regular basis."

An order consistent with this opinion and incorporating the amount of the preference is to be submitted for entry. Should the parties be unable to agree on the amount of the preference, the court will schedule a hearing to resolve matters which cannot be resolved by the parties.