**In re CONTEMPRI HOMES, INC., Debtor.**

**Official Committee of Unsecured Creditors of Contempri Homes, Inc. on behalf of the Ch. 11 Estate of Contempri Homes, Inc., Plaintiff,**

**v.**

**Seven D Wholesale and Seven D. Wholesale, Inc., Defendants.**

**Bankruptcy No. 5–97–00496.
Adversary No. 5–98–00286A.**

United States Bankruptcy Court, M.D. Pennsylvania.

Oct. 17, 2001.

William Burnett, Earl Forte, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for plaintiff.

Eugene C. Kelley, Hoegen, Hoegen & Kelley, Wilkes–Barre, PA, for defendants.

## *OPINION*[1]

JOHN J. THOMAS, Bankruptcy Judge.

The above-captioned adversary[2] was initiated by a Complaint of the Official Committee of Unsecured Creditors of the Debtor (hereinafter "Plaintiff") seeking to avoid certain transfers pursuant to both 11 U.S.C. §§ 547 and 549. The Defendants deny the transfers were preferential under the dictates of Section 547(b)[3], but, alter-

---

1. Drafted with the assistance of Richard P. Rogers, Law Clerk.

2. By Stipulation dated March 23, 2000 and filed with the Court April 13, 2000, the caption was amended to reflect the addition of Seven D Wholesale, Inc. as a Defendant.

3. 11 U.S.C. § 547(b)
(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

natively argue to the extent the court finds any preferential transfers, they are protected by the "safe harbor" provisions articulated in Section 547(c)(1), (2), and (4)[4].

By Joint Exhibit No. 1 (Stipulation of Facts), the parties stipulated the Plaintiff established elements of proof under Section 547(b)(1), (3), (4), and (5). Left for resolution was whether the Plaintiff met its burden under Section 547(b)(2), proving that the transfers in question were for or on account of an antecedent debt owed by the Debtor before such transfers were made. 11 U.S.C. § 547(b)(2).

Joint Exhibit No. 1 also provided the date of the filing of the bankruptcy and the date the parties agreed was the 90th day before the filing date. Paragraph 4 contains a list of the pre-petition checks including the date, number, amount, and honor date of each check. Paragraph 7 sets forth three separate checks the parties agreed were transferred after the commencement of the Debtor's case without Bankruptcy Court authorization. Again, the parties stipulated to the date, number, amount, and honor date of the checks.

The Plaintiff has the burden of proving the avoidability of transfers under subsection (b) of Section 547 and the Defendants, against whom recovery is sought, have the burden of proving the non-avoidability of any transfer under subsection (c) of Section 547. 11 U.S.C. § 547(g).

The Plaintiff's main witness was Karen Anderline. She testified she worked in the accounts payable department of the Debtor for a twelve year period and was so employed in that position during the preferential period prior to the bankruptcy. Ms. Anderline testified as to the mechanics of writing checks and matching the amount of those checks with particular invoices paid by an identifiable check. In other words, Ms. Anderline testified to the date of each check, the amount of each check, the check numbers, the honor date, and the invoices paid by each check. The exhibit listing the checks together with the invoice numbers are found in Plaintiff's Exhibit No. 18.

On cross-examination, Ms. Anderline testified the Debtor had a credit limit with the Defendants of $250,000.00 and once the credit limit was reached, the Defendants would not deliver goods to the Debtor unless a payment approximating the amount of the newly shipped goods was made at or near the time of delivery. She testified that while the amounts of the checks approximated the amount of material being delivered, the check was credited to old invoices and not current invoices.

This payment arrangement between the parties was more detailed by the Defen-

---

4. 11 U.S.C. § 547(c)(1), (2) & (4)

(c) The trustee may not avoid under this section a transfer—
(1) to the extent that such transfer was—
(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
(B) in fact a substantially contemporaneous exchange;
(2) to the extent that such transfer was—
(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(C) made according to ordinary business terms; ...
(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
(A) not secured by an otherwise unavoidable security interest; and
(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

dants' primary witness, Mr. Richard Frusciante, the general manager for Seven D Wholesale's Scranton office. Mr. Frusciante's testimony emphasized the long-standing terms of payment established between the parties. He testified that when the parties reached their credit limit, they would work out an arrangement where the Debtor would pay the oldest outstanding invoices first to keep their overdue balance manageable so that once the spring weather broke, the Debtor would be able to get current within a short period of time. (Transcript of 01/18/2000 at 67 (Doc. # 23A).) The determining factor as to the amount of each payment was the dollar amount of the current materials shipped by the Defendants to the Debtor. (Transcript of 01/18/2000 at 69 (Doc. # 23A).) The internal bookkeeping procedure of the Defendants was to apply the check to pay oldest invoices first. "We [Seven D. Wholesale] would come up with the dollar amount and we would try to match the oldest invoices to that dollar amount as best we could, to keep them within a manageable days [sic]." (Transcript of 01/18/2000 at 69 (Doc. # 23A).) "The checks basically matched up with material that we shipped over. We couldn't get an exact amount because we were paying invoices that had been invoiced prior to that but we came as close to the amount of what we shipped over to the amount that they were paying every week." (Transcript of 01/18/2000 at 78 (Doc. # 23A).) This arrangement was characterized by Mr. Frusciante as a "modified C.O.D. basis in order to keep their days as close as possible." (Transcript of 01/18/2000 at 89 (Doc. # 23A).)

This "modified C.O.D." arrangement was one that was practiced between the Debtor and the Defendants for several years prior to the bankruptcy. Apparently, the Debtor's business would become slow during winter months but, when the weather broke in the springtime, business would increase. It was during the slow winter months that the parties agreed to the "modified C.O.D." arrangement. Checks would approximate the amount of the materials shipped to the Debtor. Some of the checks were for amounts greater than the value of materials shipped and some were in amounts less than materials shipped. Most of the checks paid invoices which were several months old.

When questioned about the range of terms typical in the type of industry engaged by the Defendants, Mr. Frusciante said, "Well we used those kind of terms before when I was at North Branch, and we have the same type of terms at Seven D Wholesale. I can't tell you for sure what everybody else does out there, but I do talk to a lot of sales people and I know on different accounts they work special arrangements and so on and so forth." (Transcript of 01/18/2000 at 64 (Doc. # 23A).)

■ The Plaintiff argues all the payments during the ninety days prior to the bankruptcy were payments to the Defendants on account of antecedent debts. In response, the Defendants argue the Plaintiff's entire case rests only on the fact the payments were credited to aged invoices. Furthermore, Defendants assert payment of the aged invoices was by specific design and the only inference drawn is that this was the normal routine practiced between the parties. Furthermore, the Court only needs to look to the amount of each check and compare them to the amount of materials transferred to determine the payments were for materials currently delivered and not for antecedent debt.

■ The term "antecedent debt" is not defined by the Bankruptcy Code. But a debt is antecedent if it is incurred before the transfer. In other words, the debt

must have preceded the transfer. See 5 Lawrence P. King Collier on Bankruptcy, ¶ 547.03[4] at 547–33 (15th ed. rev.2001). The testimony clearly reveals that the Defendants did not even apply the payments made by the Debtor in the order of the old invoices. In other words, the Defendants would pick and choose aged invoices in order to approximate or equal the amount of the material delivered to the Debtor. The clear intent was always that the current payment would be applied to aged, existing invoices. If the payments were applied to satisfy current invoices with any remaining amount being applied to aged invoices, then perhaps an argument could be made by the Defendants that the amount over and above the payment of the current invoice could be considered a preference. This argument was made and accepted by the court in the *Matter of Advance Glove Manufacturing Co.*, 42 B.R. 489 (Bankr.E.D.Mich.1984). In *Advance Glove,* the parties also had a long-running business relationship. The debtor would call the creditor and inform the creditor how much money the debtor had available to spend. Shipment would be made only if the debtor could assure payment for not only the current shipment but also if payments were made on existing indebtedness. In that case, the value of the material shipped did not always correspond with the amount of the payment. Often the payments exceeded the value of the materials shipped. While the bookkeeping plan between the parties shifted to a running outstanding balance, the court found that the treatment of the funds received in excess of the value of the goods shipped was to reduce some of the existing indebtedness.

Based upon the testimony that all of the payments made were posted to aged invoices and that none of the payments made were applied to the current invoices for current materials shipped, the Court is compelled to find all payments during the pre-petition period were made for or on account of antecedent debt between the parties. The Court further finds that the Plaintiff has met its burden under 11 U.S.C. § 547(g).

Because the evidence established the preferential nature of all the pre-petition payments, the burden shifts to the Defendants to prove one of the enumerated exceptions to preferential transfers found in Section 547(c). As indicated earlier, the Defendant has asserted the exceptions under Section 547(c)(1), (2), and (4) and the Court will address those seriatim.

■■■■ Under 11 U.S.C. § 547(c)(1), three requirements must be met. First, the creditor must have extended new value to the debtor. Secondly, the parties must have intended that the new value and the transfer by the debtor be contemporaneous. Finally, the exchange must be, in fact, a substantially contemporaneous exchange. The Defendants did provide new value to the Debtor. An argument can also be made that the exchange for new value was substantially contemporaneous. The issue, however, is whether the parties intended the transfers to be contemporaneous exchanges for new value.

The evidence is irrefutable that the intention of the parties was that the checks transferred during the preferential period were earmarked and applied to old invoices. Attached to each check is a list of the old invoices to which that check was applied. (Plaintiff's Exhibit 18) The evidence further reflects that the new value exchanged was not paid for by the Debtor during the preference period. To the contrary, the evidence shows that transfers were made on dated invoices which the Court has earlier determined were antecedent debt. *In re Ajayem Lumber Corp. (Sapir v. Keener Lumber Company),* 143

B.R. 347 (Bankr.S.D.N.Y.1992). Furthermore, payments made to a supplier of goods as a prerequisite to the shipping of more goods to the debtor are not intended by the parties as a contemporaneous exchange for new value even though the payments roughly correspond to the value of the new goods shipped. See *In re Fasano/Harriss Pie Company (Remes v. Acme Carton Corporation)*, 71 B.R. 287 (W.D.Mich.1987).

■ In addressing Section 547(c)(2), the payment arrangements testified to by a representative of the accounts payable department of the Debtor and the general manager of the Defendants reflect the payments were made in the ordinary course of business transactions between those two entities. The evidence was undisputed that the Debtor, for several winters prior to the filing of the bankruptcy, fell behind in payments because of the seasonal sensitivity of the business. Once a credit limit was met, the parties went into this "modified C.O.D." payment plan. The evidence supports a finding that the elements of Section 547(c)(2)(A) were established. Lacking, however, is evidence the transfer was made according to ordinary business terms. The Third Circuit has addressed the Section 547(c)(2) exception several times. See *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corporation*, 891 F.2d 66 (3rd Cir.1989) and *In re Molded Acoustical Products (Fiber Lite Corp. v. Molded Acoustical Products)*, 18 F.3d 217 (3rd Cir.1994). In the *Molded Acoustical Products* case, Judge Becker does an excellent job of articulating what is contemplated by the term "ordinary business terms".

We believe that the Court of Appeals for the Seventh Circuit

> delivered the best rendering of the text of § 547(c)(2)(C) when it held that " 'ordinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir.1993) (emphasis in original). We will embellish the Seventh Circuit test, however, with a rule that subsection C countenances a greater departure from that range of terms the longer the pre-insolvency relationship between the debtor and creditor was solidified.

*Id.* at 220.

The Third Circuit expanded on some of the factors this Court should examine in making this determination, such as the duration of the pre-insolvency relationship between a debtor and a creditor, and whether that relationship, in terms of payment and credit history, changed during the period prior to the slide into bankruptcy.

Similarities between the *Molded Acoustical Products* case and the instant case are more than relevant to final resolution. The Court earlier cited testimony from the manager of the Defendants which capsulized the only evidence concerning industry standards presented in this case. (See quote of Defendants' manager, Mr. Frusciante, cited above on page 127.) This is sparse evidence of industry standards. The same held true in the *Molded Acoustical Products* case where the creditor proffered a comparison of a debtor's payment history with two other firms to whom it had sold goods. The Circuit found that this evidence was insufficient.

While the testimony here indicates how the Defendants dealt with several of their customers, they presented little evidence

to support industry-wide practices and, for this reason, I find that the creditor has not met its burden under Section 547(c)(2).

The last exception called into play by the Defendants is that under Section 547(c)(4). Three requirements must be met to bring a preferential transfer within this exception.

First, the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b). Second, after receiving the preferential transfer, the preferred creditor must advance "new value" to the debtor on an unsecured basis. Third, the debtor must not have fully compensated the creditor for the "new value" as of the date that it filed its bankruptcy petition. See *In re Almarc Manufacturing, Inc.*, 62 B.R. 684, 686 (Bankr.N.D.Ill.1986). If a creditor satisfies these elements, it is entitled to set off the amount of the "new value" which remains unpaid on the date of the petition against the amount which the creditor is required to return to the trustee on account of the preferential transfer it received. *Id.*

*In re New York City Shoes, Inc.*, 880 F.2d 679, 680 (3rd Cir.1989).

Mechanically, how does the Court apply these requirements to the facts in issue here? Initially, the Court must address when a transfer takes place. Here the transfers were made by currently-dated checks not subsequently dishonored. While not a part of the holding in the Third Circuit case of *In re New York City Shoes, Inc.*, the Third Circuit wrote that the date of transfer of a currently-dated check is the date the check is delivered to the creditor. The court reasoned that permitting creditors to rely on the receipt of the check as the transfer date, as opposed to requiring them to wait until the check is honored by the bank, serves the purposes of Section 547(c)(4) because this encour-

ages creditors to continue to do business with troubled enterprises and it allows the debtor to continue to conduct its business in its ordinary manner. *Id.* at 683.

Holding that the transfer occurs upon receipt of the check for these purposes furthers the goal of § 547(c)(4) and leads to a more appropriate result in policy terms. In most cases, absent a post-dated check or a request to hold the check, parties in a normal business transaction would, as the parties did here, treat a check as a cash transaction and extend new credit immediately upon receiving a check in payment of a prior debt rather than waiting until the check has cleared to send new goods.... There is no policy reason why a creditor who waits for a check to clear before shipping should get the benefit of the § 547(c)(4) setoff while a creditor who, doing what most business people do, ships on receipt of a check should be denied a setoff.

*In re Almarc Mfg., Inc.*, 62 B.R. 684, 688. *Cf. Braniff Airways, Inc. v. Midwest Corp.*, 873 F.2d 805, 806–08 (5th Cir.1989). See also, *In re Thomas W. Garland, Inc. (Garland v. Union Electric Co.)*, 19 B.R. 920 (Bankr.Mo.1982).

I hold the date of transfer within the context of Section 547(c)(4) occurs on the date that a payment by check is received by the creditor. Those dates of receipt are found in Plaintiff's Exhibit No. 18. The initial transfer within the preference period was by a check dated 11/21/96 and delivered to the Defendants on 11/25/96.

The Plaintiff argues the new value defense only gives a partial defense to the Defendants. Under the Plaintiff's view, the Defendants are still liable for approximately $190,000.00. The Plaintiff's approach is a transactional approach. In other words, the Court is to take the new

value given by a creditor and offset it only against immediately preceding preferences. This is an approach which was followed in the case of *Leathers v. Prime Leather Finishes Co.*, 40 B.R. 248 (D.Maine 1984). This minority rule allows an extension of new credit to be applied only to the immediately preceding preference. *In the Matter of Micro Innovations Corp. (Williams v. Agama Systems, Inc.)*, 185 F.3d 329 (5th Cir.1999).

The better approach and the one which is adopted by this Court is that of the approach derived from the case of *In re Thomas W. Garland, Inc.*, 19 B.R. 920 (Bankr.E.D.Mo.1982). "Under this method, subsequent advances of new value may be used to offset prior (although not immediately prior) preferences. A creditor is permitted to carry forward preferences until they are exhausted by subsequent advances of new value." *In re IRFM, Inc.*, 52 F.3d 228 (9th Cir.1995). See, also *Crichton v. Wheeling National Bank*, 902 F.2d 257, 259 (4th Cir.1990); *In the Matter of Micro Innovations Corporation*, 185 F.3d 329 (5th Cir.1999); *In re R.M.L., Inc.*, 195 B.R. 602, 616 (Bankr.M.D.Pa. 1996).

The Court will apply the *Garland* approach to calculate the extent, if any, the Defendants gave new value to the benefit of the Debtor. The total amount of the checks transferred by the Debtor to the Defendants, as more fully set forth on the Joint Stipulation of Facts (Joint Exhibit No. 1), totals $230,792.13. The new value

transferred from the Defendants to the Debtor totals $186,100.38 [5]. Based upon the foregoing numbers, the Court finds that the total amount of transfers from the Debtor to the creditor, which are not protected by the exception provided by Section 547(c)(4), amount to $44,691.75.

Finally, the Court must address three post-petition transfers which the Plaintiff asserts are avoidable transfers under 11 U.S.C. § 549(a). These checks are represented in Plaintiff's Exhibit No. 18 under tabs 14, 16 and 17 and total $14,834.98. All three transfers are represented by checks dated and delivered to the Defendants prior to bankruptcy but honored post-bankruptcy.

Section 549(a) provides as follows: (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—(1) that occurs after the commencement of the case; and (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or (B) that is not authorized under this title or by the court. The Defendants argue these are not post-petition transfers because they were C.O.D. deliveries.

■ For purposes of determining when a transfer takes place under Section 549, the date on which a check is honored, rather than the delivery of the check, is the date of the transfer. *In re Mora*, 218 B.R. 71 (9th Cir. BAP 1998); *In re Mills*, 176 B.R. 924 (D.Kan.1994); *In re Williams*, 1997 WL 252649 (Bankr. W.D.Tenn.1997) *citing In re Wilson*, 56

---

5. The Court makes the calculation of new value by totaling the invoices which were presented to the Court by way of Exhibits D–3 and D–4. Exhibit D–3 reflects the invoices for new materials shipped by the Seven D Wholesale of Scranton office to the Debtor. The invoices which were added are reflected on page 2 beginning with the transaction date of 11/26/96, Invoice no. 00033972, and continuing seriatim through the bottom of page 3 of

the Exhibit ending with the transaction date of 2/14/97, Invoice no. 00035452. Exhibit D–4 is a list of invoices from the Seven D. Industries, Inc. of Tyrone, Pennsylvania office which also made transfers to the Debtor. The calculations there start with invoices for transaction date 12/03/96, Invoice no. T00007786, through and including transaction dated 02/13/97, Invoice no. T00008042.

B.R. 74 (Bankr.E.D.Tenn.1985); *In re Rainbow Music, Inc.*, 154 B.R. 559 (Bankr. N.D.Ca.1993); and *In re Bellamah Community Development*, 139 B.R. 29 (Bankr. D.N.M.1992). The Court finds the three transfers set forth in paragraph 7 of the Joint Stipulation of Facts are unauthorized post-petition transfers under the dictates of 11 U.S.C. § 549(a).

Based upon the foregoing, judgment will be entered in favor of the Plaintiff and against the Defendants in the total amount of $59,526.73, said amount representing the total of preferential payments not falling within the exceptions provided by 11 U.S.C. § 547(c) and the post-petition avoided transfers under 11 U.S.C. § 549.