In re COMPUTER PERSONALITIES SYSTEMS, INC., Debtor,

and

Lawrence Lichtenstein, Appellee,

v.

ASPECT COMPUTER, Appellant.

No. CIV.A.04–3815.

United States District Court, E.D. Pennsylvania.

Feb. 22, 2005.

D. Alexander Barnes, Edmond George, Philadelphia, PA, for Plaintiff.

Aspect Computer Corporation, Somerset, NJ, pro se.

Daniel M. Eliades, David S. Caruogno, Rochelle Park, NJ, William A. Calandra, Forman, Holt & Eliades, LLC, Philadelphia, PA, for Appellant.

Lawrence Lichtenstein, Haddonfield Heights, NJ, pro se.

## MEMORANDUM

DuBOIS, District Judge.

### I. BACKGROUND

Presently before the Court is an appeal by Aspect Computer Corporation ("Aspect" or "Creditor"), from an order of the United States Bankruptcy Court for the Eastern District of Pennsylvania granting summary judgment in favor of the trustee for the debtor, Computer Personalities Systems, Inc. ("CPSI" or "Debtor").

CPSI was a retail computer company doing business through direct retail store sales and television infomercials. CPSI was owned entirely by its principal and president, George Capell. Aspect supplied wholesale computer systems, components, and accessories to CPSI. Jonathan Chu ("Chu") is the Chief Executive Officer of Aspect.

On March 23, 2001, CPSI filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code. The Debtor's case was thereafter converted from a Chapter 11 to a Chapter 7 proceeding and Lawrence Lichtenstein ("Trustee") was appointed Chapter 7 Trustee for the Debtor's bankruptcy estate.

On May 31, 2002, pursuant to 11 U.S.C. §§ 547 and 550, the Trustee filed a Complaint against Aspect seeking to avoid two transfers made by Debtor to Aspect during the ninety-day period preceding the petition date in the amounts of $426,565.00 and $610,347.00 (the "transfers"), totaling $1,036,912.00.

In the proceeding before the Bankruptcy Court, CPSI and Aspect filed cross-motions for summary judgment. On July 2, 2004, the Bankruptcy Court ruled that Aspect had not demonstrated the applicability of 11 U.S.C. § 547, and the transfers should be avoided. Accordingly, the Trustee's Motion for Summary Judgment was granted.

Aspect raises only one issue on appeal. It argues that the transfers were contemporaneous exchanges for new value in accordance with 11 U.S.C. § 547(c)(1), and should be excluded from the trustee's avoidance power. For the reasons that follow, the decision of the Bankruptcy Court is affirmed.

### II. FACTS

The Bankruptcy Court set forth the undisputed facts of the case as follows:

Aspect's business relationship with CPSI commenced when Aspect began shipping goods to CPSI on January 7, 2000. Aspect utilized a company called Zoom–Tek as a sales broker for the CPSI account relationship. Brian Tsang was an employee of Aspect who was involved in managing the account relationship with Zoom–Tek and CPSI. Zoom–Tek was authorized to collect payments from CPSI on behalf of Aspect. Bill Bisignano worked for Zoom–Tek and had authority to collect past due accounts on behalf of Aspect.

Aspect sold goods to Debtor and the invoices reflecting these sales typically

stated terms of net thirty days. Aspect would generate invoices for CPSI at the time of shipping, and delivery to CPSI would typically be done the same day. In 1999 and 2000, about half of Aspect's customers were on thirty day terms, which was the most favorable extension of credit. In 2000, for those customers of Aspect who were on thirty day terms, approximately sixty percent paid within terms and about forty percent would pay one to seven days late. CPSI, however, consistently paid its invoices late, averaging seventy-five days post-invoice. CPSI normally paid Aspect by a check drawn on its bank account.

Aspect has no formal policy as to how payments are applied to invoices. Nor is there any consistent practice clear on this record. Mr. Chu's statements are inconsistent, stating both that application of payments is a ministerial function performed by Aspect's accounting software, which uses a "first in, first out" method to apply payments to the oldest invoices first, and that application of payments is something that can vary depending upon the salesperson for the account.[1]

In October and November 2000, Chu became concerned about the credit worthiness of CPSI. In November and December of 2000, CPSI was already over their total credit limit[2] and had too many unpaid invoices that were aged beyond 30 days. At some point in November and/or December, Chu asked Zoom–Tek to obtain a personal guarantee from George Capell.[3] There is no evidence that Capell ever provided such a guarantee.

Aspect had a policy that if a customer was over its credit limit, Aspect would require that further orders be paid for C.O.D. Aspect asserts that it applied this policy to CPSI toward the end of 2000: "Despite this situation, CPSI still wanted to purchase more systems. On one hand, CPSI represented a large volume customer and ... a potential source of profit for Aspect. On the other hand, the amount and age of the outstanding indebtedness rendered CPSI a substantial credit risk. Consequently, in order to limit further exposure I, in conformance with Aspect's policy and practices, conditioned further shipments to CPSI upon a substantially contemporaneous delivery of a payment/check for approximately the same amount as the shipment. Thus, CPSI was essentially converted to a 'C.O.D.' customer." Chu Aff. ¶ 8–9.

Aspect concedes that this arrangement was not reduced to writing, though it has identified E-mails from Zoom–Tek employees to Buttery [CPSI's Chief Fi-

---

1. Aspect states that it "did not maintain any policy as to how received payment would be applied against outstanding invoices, rather it was a bureaucratic, ministerial function left to the Accounting Department." However, Aspect contends that there was an understanding with CPSI that any further delivery of product was conditioned upon a contemporaneous delivery of equivalent payment. (Appellant Br. at 6, 7).

2. The record is unclear as to the amount by which CPSI exceeded its credit limit. A letter dated November 30, 1999 from an Aspect employee states a credit limit of $ 2.5 million

and payment terms of 30 days net. However, Chu asserted that the credit limit was $ 1.5 million. Finally, Brian Tsang, who purportedly handled this account, testified that the credit limit was $2.0 million. *In re Computer Personalities Sys.*, 2004 WL 1607005, *2 n. 1, 2004 Bankr.LEXIS 941, *6 n. 1 (Bankr. E.D.Pa. July 2, 2004).

3. Aspect contends that it did not "demand" a personal guaranty, bur rather suggested it in response to an unacceptable proposed payment plan put forward by the Debtor. (Reply at 3).

nancial Officer] which support communication of such a policy. See Exhibit B to Aspect's Motion at EM–1 (E-mail dated 10/17/00: "This balance does not get smaller, only changes its age with new payments since they are against an equal amount of shipped systems."); EM–4 (E-mail dated 11/06/00: proposing delivery schedule with corresponding payments by CPSI required to take receipt of deliveries); EM–5 (E-mail dated 10/26/00: "Payment will be on a one to one basis, just as we have been doing"). There is, however, no statement or correspondence from CPSI on this record which acknowledges its understanding of a change to the payment policy.

The Transfers are two checks written by the Debtor to Aspect which total $ 1,036,912.00. Check Number 1016, in the amount of $ 426,565, was received by Aspect on December 12, 2000. This check, however, was postdated December 22, 2000 and honored by the Debtor's bank on December 26, 2000. Check number 1426, in the amount of $ 610,347, was received by Aspect on December 15, 2000, though it was postdated January 4, 2001 and honored on January 8, 2001 (hereinafter, the "Transfer Checks"). There is no evidence that CPSI had ever paid by postdated checks in the past. Chu's recollection is that the idea came from either Zoom–Tek or CPSI.[4] He concedes that it was uncommon for Aspect's customers to pay by postdated

check and could not recall any other customer who had done so.

Between December 14 and 21, Aspect [ ] made the following shipments to CPSI, totaling $ 1,410,856.00 (collectively the "December Shipments"):

| Date | Invoice number | Amount |
|------|------|------|
| Dec. 14, 2000 | 1100562–4 | $ 23,210.00 |
| Dec. 14, 2000 | 1100821 | $ 75,648.00 |
| Dec. 15, 2000 | 1100823 | $ 160,752.00 |
| Dec. 15, 2000 | 1100822 | $ 75,648.00 |
| Dec. 16, 2000 | 1100818 | $ 67,520.00 |
| Dec. 16, 2000 | 1100123–2 | $ 124,100.00 |
| Dec. 16, 2000 | 1100822–2 | $ 42,552.00 |
| Dec. 19, 2000 | 1201021 | $ 236,400.00 |
| Dec. 21, 2000 | 1100560–2 | $ 143,480.00 |
| Dec. 21, 2000 | 1201021–2 | $ 118,200.00 |
| Dec. 21, 2000 | 1201020–2 | $ 124,100.00 |
| Dec. 21, 2000 | 1201020 | $ 124,100.00 |
| Dec. 21, 2000 | 1201019 | $ 62,050.00 |
| Dec. 21, 2000 | 1201018 | $ 33,096.00 |

The relationship between the Transfers and the December Shipments is hotly contested. Aspect asserts that both it and CPSI intended that the Transfers were contemporaneous payment for the December Shipments consistent with the C.O.D. policy.[5]

The Trustee asserts that the Transfers were payments toward CPSI's past due account, and that the December Shipments were merely a continuation of a credit relationship. The Trustee relies upon spreadsheets produced by Aspect in discovery as well as attached to its proof of claim, which indicate that the Transfers were applied to old invoices

---

**4.** Aspect emphasizes that the postdated checks were not Aspect's idea—that they were not demanded but were an accommodation to the Debtor. (Reply at 3).

**5.** Aspect proffers an e-mail from Zoom–Tek to CPSI dated December 12, 2000, which references checks with dates matching those of the transfer checks received by Aspect: "We discussed one today and one Friday, we never discussed anything on Monday. If your [sic]

postdating checks what is the difference? We are making deliveries today based on these post dated checks. If we don't get them, what deal did we cut? I know your [sic] worried about us depositing them early. We won't deposit them until you give us the go ahead." *In re Computer Personalities Sys.*, 2004 WL 1607005 at *4, 2004 Bankr.LEXIS at *9.

rather than the invoices for the December Shipments.[6] Moreover, there are also email communications between Zoom–Tek and CPSI in early December exchanging proposals regarding future payments, at least one of which matches the amount of Check No. 1016, which are applied to invoices older than the December Shipments.[7] Notwithstanding Chu's testimony as to a C.O.D. arrangement, all of the December Shipment invoices contain a "payment details" box under which is checked "check (net 30)."

*In re Computer Personalities Sys.*, 2004 WL 1607005, *3–4, 2004 Bankr.LEXIS 941, *3–11 (Bankr.E.D.Pa. July 2, 2004) (internal citations omitted).

### III. Standard of Review

■ This Court has appellate jurisdiction over the appeal from the Bankruptcy Court pursuant to 28 U.S.C. § 158(a). On appeal, a district court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir.1999). The court reviews the legal determinations *de novo. J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891 F.2d 66, 69 (3d Cir.1989).

Federal Rule of Civil Procedure 56 governs motions for summary judgment and is applicable to this proceeding pursuant to Federal Rule of Bankruptcy 7056. *See Burtch v. Ganz*, 282 B.R. 805 (E.D.Pa. 2002). Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The summary judgment determination is "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, "a motion for summary judgment must be granted unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987).

"[O]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). The nonmoving party, however, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support its claim. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982). When the movant files a properly supported motion for summary judgment, the burden shifts to the nonmoving party to prove "specific facts showing that there is a genuine issue

---

6. Aspect concedes that most of the spreadsheets show payments being applied to older invoices, but explains that they are automatically generated by Aspect's accounting software rather than pursuant to any type of agreement or policy. (Appellant Br. at 7).

7. The Trustee also references a December 7, 2000, email that Zoom–Tek sent to CPSI indicating that payments were applied to older invoices rather than the last shipment. (Appellee Br. at 8).

for trial." Fed.R.Civ.P. 56(e). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## IV. DISCUSSION

A trustee in bankruptcy has the power to avoid preferential transfers for antecedent debts under 11 U.S.C. § 547(b).[8] The initial burden of showing that a transfer is preferential rests with the trustee. *Id.* Aspect concedes that the Trustee has satisfied the prima facie elements for the avoidance of the transfers. (Appellant Br. at 11). Therefore, the burden shifts to the creditor to prove the nonavoidablity of a transfer. 11 U.S.C. § 547(g). Subsection (c) of section 547 sets forth the exceptions to a trustee's power to avoid transfers.

In this case, Aspect bears the burden of establishing that the transfers are protected by the "safe harbor" provisions of § 547, and thus not avoidable. Aspects seeks to exclude the transfer of two checks, check numbers 1016 and 1426, from the Trustee's avoidance powers by means of the contemporaneous exchange exception under 11 U.S.C. § 547(c)(1).

Section § 547(c)(1), provides that a transfer is not avoidable as a preference: (1) to the extent that such transfer was— (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange. In order to successfully invoke this defense, Aspect must prove that (1) it extended new value to CPSI,[9] (2) the parties intended the new value and the transfers to be contemporaneous exchanges; and (3) the exchanges were, in fact, substantially contemporaneous.

█ The purpose of allowing a trustee to avoid pre-bankruptcy transfers of the debtor's property is to discourage creditors from "racing to the courthouse to dismember a debtor during its slide into bankruptcy." *See In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir.2000). Consistent with this purpose, the contemporaneous exchange exception provides that a transaction is not a preferential transfer if the creditor provides new value in exchange for the debtor's contemporaneous transfer of payment. *Id.* at 873. Section § 547(c)(1) encourages creditors to continue to work with troubled debtors. Moreover, other creditors are not adversely affected by such an exchange because the debtor's estate has received new value. *In re Jones Truck Lines, Inc.*, 130 F.3d 323, 326 (8th Cir.1997) ("Contemporaneous new value exchanges are not preferential be-

---

**8.** A trustee may avoid a transfer if it is established that it was (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made—(A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) that enables such creditor to receive more than such creditor would

receive if—(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title. 11 U.S.C. § 547(b).

**9.** 11 U.S.C. § 547(a)(2) defines new value as "money or money's worth in goods, services, or new credit."

cause they encourage creditors to deal with troubled debtors and because other creditors are not adversely affected if the debtor's estate receives new value.")

It is well settled that a payment applied to a past debt in exchange for new value does not fall within § 547(c)(1). *See, e.g., In re Wadsworth Bldg. Components, Inc.,* 711 F.2d 122, 125 (9th Cir.1983); *In re Contempri Homes, Inc.,* 269 B.R. 124, 128 (Bankr.M.D.Pa.2001); *In re Advance Glove Manufacturing Co.,* 42 B.R. 489, 493 (Bankr.E.D.Mich.1984). A seller who conditions continued deliveries to a debtor on the debtor's payment of old invoices cannot claim the protection of § 547(c)(1) even though the debtor's payment to the seller and the seller's transfer of property to the buyer occurred contemporaneously. *In re Wadsworth Bldg. Components, Inc.,* 711 F.2d at 122.

Turning to the facts of this case, the Court concludes that the first requirement of § 547(c)(1)—the extension of new value—is met. On December 14, 15, 16, 19 and 21, Aspect shipped goods totaling $1,410,856 to CPSI.

With regard to the second requirement of § 547(c)(1), the Third Circuit has held that "[t]he critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." *In re Spada,* 903 F.2d 971, 975 (3d Cir.1990) (citing *In re Prescott,* 805 F.2d 719, 727 (7th Cir.1986)). This determination of the parties intent is a question of fact. *Id.* In *Spada,* the court held that there must be some manifest desire by the parties of a contemporaneous exchange for new value to sustain a finding of intent. *Id.*

In this case, Aspect concedes that there was no clear agreement between the parties that the transfers were intended to be contemporaneous exchanges for new value

or whether the transfers were intended as payment of past debts. (Reply at 8). Nevertheless, based on *In re Advance Glove Mfg. Co.,* 42 B.R. 489 (Bankr. D.Mich.1984), Aspect argues that the agreement between the parties "that there would be no shipment without payment and that the amount of the payment had to at least equal the amount of the new shipments" is sufficient to satisfy the intent requirement of § 547(c)(1). (Reply at 5).

In *Advance Glove,* the debtor and creditor had an agreement that shipments would only be made if the debtor could assure payment for both the current shipment of goods and the existing indebtedness. 42 B.R. at 493. As a result, the cost of the material shipped did not always correspond with the amount of payment. *Id.* The financial records reflected a running outstanding balance rather than new payments being applied against new shipments. Notwithstanding this fact, the court found that the parties intended the shipments and payments to constitute contemporaneous exchanges for new value and did not permit the trustee to avoid the transfer. *Id.*

The glaring difference between this case and *Advance Glove* is that in this case it is unclear whether the parties intended to treat the transfers as contemporaneous with new value. As a matter of fact, Aspect concedes that there was no clear agreement on this issue.

Under these circumstances, the Court will look to the conduct of the parties in an attempt to determine their intent. On the one hand, the alleged C.O.D. agreement and e-mail correspondence stating that shipments would be on a one-to-one basis with payment supports a finding that parties intended the shipments and payments to be contemporaneous exchanges for new

value.[10] On the other hand, there are several spreadsheets, including Aspect's own Proof of Claim, that apply the checks at issue to specific invoices other than the invoices for the December shipments. Moreover, the amount of the transfers do not match the invoices of any one of or collection of the December invoices and they fall short of the amount of the December shipments by almost $400,000.

The Court concludes, as did the Bankruptcy Court, that there is conflicting evidence on the question whether the parties intended a contemporaneous exchange for new value. *In re Computer Personalities Sys.*, 2004 WL 1607005 at *8, 2004 Bankr.LEXIS 941 at *28. That presents a genuine issue of material fact which precludes the granting of summary judgment on that issue. Notwithstanding this determination, the Court affirms the decision of the Bankruptcy Court because Aspect has failed to satisfy the third requirement of § 571(c)(1)—that the exchanges were *in fact* substantially contemporaneous.

In *New York City Shoes, Inc. v. Bentley Int'l*, 880 F.2d 679 (3d Cir.1989), the Third Circuit addressed the question whether a postdated check should be considered "transferred" under § 547(c)(4), which allows a creditor to retain an otherwise voidable preference if the creditor gave the debtor new value for the preferential transfer. The court held that there is a rebuttable presumption that postdated checks are transferred "either on the date on the face of the check, or on the date that the check clears the bank, as opposed to the date on which the check was deliv-

ered." [11] *New York Shoes*, 880 F.2d at 679. That presumption may be rebutted in "cases in which a check is so slightly postdated, the solvency of the debtor is so patent or widely believed, or the intent of the parties is so explicit, that it becomes clear that the parties were treating the postdated check as cash." *Id.* at 684.

█ Applying *New York Shoes* to the facts of this case, the Court concludes the checks were not transferred contemporaneously with the shipments. There is a presumption that postdated checks are transferred either on the dates on the face of the checks or on the dates the checks clear the bank. Those dates in this case are between one and three weeks after delivery of the goods. Although the presumption may be rebutted when a check is only "slightly postdated" and the solvency of the debtor is patent, the extent of the postdating in this case does not fall within the "slightly postdated" category, and the solvency of CPSI is not patent. *See id.* Therefore, the exchanges of the checks and the shipments were not, in fact, substantially contemporaneous.

Aspect argues that the legislative history of § 547(c)(1) is dispositive of the issue of contemporaneity. It states:

"Normally, a check is a credit transaction. However, for the purposes of this paragraph, a transfer involving a check is considered to be 'intended to be contemporaneous,' and if the check is presented for payment in the normal course of affairs, which the Uniform Commercial Code specifies as 30 days, U.S.C. § 3–503(882)(a), that will amount to a

10. The Court notes that the e-mail correspondence which lends support to Aspect's argument that the parties intended the shipments and payment to be contemporaneous exchanges for new value were from Zoom–Tek, an independent broker who served as a middleman between Aspect and CPSI, to CPSI.

11. The court in *New York Shoes* did not resolve the issue of when a postdated check is transferred—the date on the face of the check or the date the check clears the bank—because the result would have been the same using either date.

transfer that is 'in fact substantially contemporaneous.' "

S.Rep. No. 989, 95th Cong., 2d Sess. 88; H.R. Rep. N. 595, 95th Cong., 1st Sess. 373, U.S.Code Cong. & Admin.News 1978, 5787, 5874, 5963, 6329. (citations omitted). Aspect asserts that the transfers were in fact substantially contemporaneous because the checks were honored before the expiration of 30 days. However, as pointed out by the Bankruptcy Court, the wrinkle in this logic is that the checks at issue were postdated. *In re Computer Personalities Sys.*, 2004 WL 1607005 at *9, 2004 Bankr.LEXIS 941 at *32. Nothing in the legislative history suggests that Congress intended the contemporaneous exchange exception to apply to postdated checks.

■ Moreover, under the U.C.C., a postdated check is technically not a check, but instead a credit instrument. *See* U.C.C. § 2–511, comment 6. Consequently, the Court agrees with Judge Sigmund's determination that the postdated checks "*in fact* were credit transactions which created an antecedent debt that was satisfied only when the checks became payable one and two weeks later." *In re Computer Personalities Sys.*, 2004 WL 1607005 at *11, 2004 Bankr.LEXIS 941 at *36.

Furthermore, the Court concludes the legislative history of § 571(c)(1) relating to dishonored checks is instructive with respect to the treatment of postdated checks. The congressional record states that if a check is dishonored, the nature of the transaction is changed. 124 Cong. Rec. H11,097 (daily ed. Sept. 28, 1978) ("pay-

ment of a debt by means of a check is equivalent to a cash payment unless the check is dishonored"). Relying on this legislative history, the court in *Stewart v. Barry County Livestock Auction, Inc. (In re Stewart)*, 274 B.R. 503 (Bankr.W.D.Ark. 2002), held that a contemporaneous exchange defense cannot involve a dishonored check. *Id.* at 512 (citing *Goger v. Cudahy Foods Co. (In re Standard Food Servs. Inc.)*, 723 F.2d 820, 821 (11th Cir. 1984)) (holding that when checks were dishonored by the bank, the transactions become credit transactions and created an antecedent debt); *see also Hall–Mark Electronics Corp. v. Sims (In re Lee)*, 179 B.R. 149, 163 (9th Cir. BAP 1995). The Court concludes that, like dishonored checks, postdated checks transferred between one and three weeks after delivery of goods changed the nature of the transaction and were not *in fact* substantially contemporaneous exchanges for new value.[12]

## V. CONCLUSION

Because Aspect has failed to satisfy its burden of showing that the transfers were, in fact, substantially contemporaneous exchanges for new value, the transfers do not fall within the contemporaneous exchange exception of § 571(c)(1), and are avoidable. Accordingly, the decision of the Bankruptcy Court is affirmed.

An appropriate Order follows.

### ORDER

**AND NOW,** this 22nd day of February, 2005, upon consideration of the appeal

---

**12.** Aspect, citing Seventh and Eight Circuit authority, urges the Court to conclude that "substantially contemporaneous" is a flexible concept. *See In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir.2000) (holding that a security interest perfected 16 days after the date of actual advance was a substantially contemporaneous exchange for the purposes of § 547(c)(1)); *see also Pine Top Ins. Co. v.*

*Bank of Am. Nat'l Trust and Sav. Ass'n,* 969 F.2d 321 (7th Cir.1992) (finding that a two to three week delay in transfer of collateral in connection with issuance of a secured standby letter of credit was substantially contemporaneous). The Court finds that *Dorholt* and *Pine Top* are not applicable to postdated checks.

from the final order of the United States Bankruptcy Court for the Eastern District of Pennsylvania granting summary judgment in favor of Lawrence Lichtenstein, the Chapter 7 Trustee of the Estate of Computer Personalities Systems, Inc. on July 2, 2004, it is **ORDERED** that the Order of the Bankruptcy Court dated July 2, 2002 is **AFFIRMED.**