In re APS HOLDING CORPORATION, APS, Inc., APS Management Services, Inc., American Parts System, Inc., APS Supply, Inc., Autoparts Finance Company, Inc., Big A Auto Parts, Inc., Installers' Service Warehouse, Inc., Parts,Inc., and Presatt, Inc., Reorganized Debtors.

Dale K. Harbour, as Plan Administrator for the substantively consolidated chapter 11 estates of APS Holding Corporation, et al., Plaintiff,

v.

ABX Enterprises, Inc., Defendant.

Bankruptcy No. 98–197 PJW.
Adversary No. 00–00237.

United States Bankruptcy Court, D. Delaware.

Aug. 21, 2002.

John C. Phillips, Jr., Phillips, Goldman & Spence, Wilmington, DE, Howard T. Duncan, Omaha, Nebraska, for defendant.

William H. Sudell, Donna L. Culver, Jason W. Staib, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for plaintiff.

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

Before the court are the cross-motions (Docs. # 22, 25, respectively) of ABX Enterprises, Inc. ("Defendant") and Dale K. Harbour ("Plaintiff") for summary judgment. I will deny both motions for the reasons discussed below.

APS Holding Corporation and certain of its affiliates (collectively, "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on February 2, 1998 ("Petition Date"). On October 19, 1999, Debtors' First Amended Joint Consolidated Liquidating Plan of Reorganization ("Plan") was confirmed. Pursuant to the terms of the Plan, Plaintiff, as Plan Administrator, is responsible for the final administration of Debtors' substantively consolidated estates, including the collection, liquidation and distribution of Debtors' remaining assets.

## Background

Prior to the Petition Date, on or about December 1, 1993 and January 1, 1997 respectively, Debtors and Defendant executed a Single Source Agreement and Transportation Agreement (collectively, "Agreements"), pursuant to which Defendant agreed to provide transportation delivery services to Debtors. (Pl.'s Br. (Doc. # 26) at 3.) Pursuant to the terms of these Agreements, Defendant leased vehicles and delivery personnel to Debtors which Debtors then used to deliver automotive products to its customers in Nebraska, Iowa and parts of Missouri. (*Id.*) Although the Agreements do not set forth a payment schedule or describe the credit terms by which Defendant provided services to Debtors, the current record indicates that the parties' agreement and/or course of dealing with respect to those terms was as follows.[1]

Defendant invoiced Debtors for delivery services on a weekly basis. (Layher Depo. at 24; Saldi Depo. at 14.) The invoices were typically hand delivered to Debtors

---

1. The current record consists of: (1) the deposition testimony of David Layher; (2) the deposition testimony of Anthony Saldi; (3) the stipulated facts set forth in the Amended Joint Pre-trial Order ("Pre–Trial Order") filed on December 21, 2001; and (4) certain exhibits marked PTX1 through PTX8 which the parties agreed, pursuant to a prior stipulation, would be deemed to be admitted without foundation. Mr. Layher was the operations manager of Debtors' Omaha distribution center for ap-proximately nine years ending in 1999, and was responsible for paying and reviewing invoices arising out of Debtors' business relationship with Defendant. (Layher Depo. at 6–8.) Mr. Saldi is Defendant's owner and president, and has been personally involved in Defendant's operation since its establishment. (Saldi Depo. at 4–5.) Both men were present during each other's deposition and were in substantial agreement as to the parties' business relationship.

on Friday of the week during which the invoiced services were rendered, or on Monday or Tuesday of the following week. (Layher Depo. at 24; Saldi Depo. at 14.) The invoices would go directly to Mr. Layher who would approve them and forward them to Debtors' corporate office for payment. (Layher Depo. at 13.) There was no established schedule according to which the invoices would be paid. (*Id.* at 13–14; Saldi Depo. at 16–17.) Rather, the time in which each invoice was paid varied depending on how long the invoice remained on Mr. Layher's desk prior to being approved and forwarded to Debtors' corporate office for payment. (Layher Depo. at 14–15.) Typically, the invoices were paid by check and it was "normal" for one check to cover more than one invoice. (*Id.* at 27–28; Saldi Depo. at 16–17.) Although Mr. Layher dealt with the invoices "as quickly as possible", there were occasions on which Mr. Saldi would contact Mr. Layher to inquire about the status of an unpaid invoice. (Layher Depo. at 26–27; Saldi Depo. at 16.) It was not typical for an invoice to be paid more than two months after the date of invoicing. (Layher Depo. at 27.) While Mr. Saldi testified that he considered payment on an invoice to be late after six to eight weeks (Saldi Depo. at 17), Mr. Layher testified that he didn't feel qualified to define a specific time frame indicating when an invoice was timely paid and when it wasn't (Layher Depo. at 30).[2]

During the ninety days preceding the Petition Date, Debtors issued checks for

delivery services provided by Defendant in an aggregate amount of $247,450.70. (Pl.'s Br. (Doc. # 26) at 4.) All but one of these payments, a check (No. 02167) dated November 5, 1997 which paid several invoices, including one dated September 1, 1997 in the amount of $15,306.25, were made within 11 to 25 days after the date of the invoice. (*Id.* at 4–5.) In addition, on January 30, 1998, Debtors made an additional payment of $32,600.00 to Defendant via wire transfer for services rendered during the weeks of January 19 and 26, 1998, and invoiced, respectively, on January 26 and February 2, 1998. (*Id.* at 5.) The wire transfer was approved by someone other than Mr. Layher. (Layher Depo. at 18.) Although it is unclear whether Debtors ever paid Defendant via wire transfer prior to January 30, 1998 (Saldi Depo. at 24), the January 30, 1998 wire transfer was the only wire transfer made by Debtors to Defendant within the year preceding the Petition Date (Pre–Trial Order (Doc. # 19) ¶ 3(j)). While Defendant continued to perform daily delivery services for Debtors subsequent to the date of the wire transfer, the "payment schedule" and "method of payment" resumed according to the "terms" described above. (Layher Depo. at 19.) This informal "procedure" remained intact until Debtors' and Defendant's relationship ended in October of 1999 when Debtors sold the Omaha operation to a third party. (*Id.*)

Plaintiff commenced the instant adversary proceeding on January 28, 2000. Pursuant to 11 U.S.C. §§ 547[3] and

---

**2.** Mr. Layher "guessed" it would be fair to conclude that an invoice paid in excess of two weeks was late, but then "guessed" one could consider an invoice paid within one month to be timely paid. (Layher Depo. at 30.)

**3.** 11 U.S.C. § 547 provides in pertinent part: (b) Except as provided in subsection (c) of this section, the trustee may avoid any

transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—

550[4], Plaintiff seeks to recover $47,906.25 in alleged preferential transfers ("Disputed Transfers") made by Debtors to Defendant within the ninety days preceding the Petition Date. (Pl.'s Br. (Doc. # 26) at 1.)[5] The Disputed Transfers consist of (1) the $15,306.25 check payment made by Debtors to Defendant on November 5, 1997; and (2) the $32,600.00 wire transfer payment made by Debtors to Defendant on January 30, 1998. (*Id.*)[6] Defendant does not dispute that the Disputed Transfers satisfy the requirements for avoidability under § 547(b), but contends that such Transfers are not avoidable because they: (1) constitute contemporaneous exchanges for new value pursuant to § 547(c)(1)[7]; and/or (2) were made in the ordinary course of business between

> (A) on or within 90 days before the date of the filing of the petition; or
> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if—
> (A) the case were a case under chapter 7 of this title;
> (B) the transfer had not been made; and
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

4. 11 U.S.C. § 550 provides in pertinent part:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> (2) any immediate or mediate transferee of such initial transferee.

5. 11 U.S.C. §§ 101 *et seq.* is hereinafter referred to as "§ __".

6. Originally, Plaintiff sought to recover $217,000.00 in alleged preferential transfers.

Debtors and Defendant pursuant to § 547(c)(2)[8]. Although this matter was originally scheduled for trial on January 7, 2002, based upon the deposition testimony of David Layher and Anthony Saldi, and the stipulated facts contained in the Pre-trial Order, the parties agreed to submit the matter on cross-motions for summary judgment.

## Discussion

### Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

However, as a result of discovery, Plaintiff has limited his request as discussed above. (Pl.'s Br. (Doc. # 26) at 1.) In addition to the Disputed Transfers, Plaintiff also seeks to recover post-judgment interest and pre-judgment interest accruing as of the Petition Date. (*Id.*)

7. Section 547(c)(1) provides:

> (c) The trustee may not avoid under this section a transfer—
> (1) to the extent that such transfer was—
> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
> (B) in fact a substantially contemporaneous exchange;

8. Section 547(c)(2) provides:

> (c) The trustee may not avoid under this section a transfer—
> (2) to the extent that such transfer was—
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (C) made according to ordinary business terms;

Fed.R.Civ.P. 56(c).[9] The moving party bears the initial responsibility of proving that no genuine issue of material fact is in dispute. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 288, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968) (citing Fed.R.Civ.P. 56(e)). In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party, and must make all inferences in favor thereof. *See, e.g., Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

In the instant proceeding, I find that the record, when construed in a light most favorable to the non-moving parties, raises genuine issues of material fact as to whether the Disputed Transfers fall within the "contemporaneous exchange for new value" and "ordinary course of business" exceptions provided for in § 547(c)(1) and (2). Accordingly, I find that neither side is entitled to summary judgment. *See* Fed.R.Civ.P. 56(c).

### Contemporaneous Exchanges for New Value

■■■ Defendant has the burden of proving the nonavoidablity of the Disputed Transfers under § 547(c). 11 U.S.C. § 547(g) (2001–02). To prevail on a "contemporaneous exchange for new value" defense under § 547(c)(1), Defendant must prove that: (1) it extended new value to Debtors; (2) the parties intended the new value and the Disputed Transfers to be contemporaneous exchanges; and (3) the exchanges were, in fact, substantially contemporaneous. *E.g., In re Contempri Homes, Inc.,* 269 B.R. 124, 128 (Bankr. M.D.Pa.2001); *Sapir v. Keener Lumber Co. (In re Ajayem Lumber Corp.),* 143 B.R. 347, 352 (Bankr.S.D.N.Y.1992).[10] While Defendant must prove all three of these factors, "[t]he critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." *Creditors' Committee v. Spada (In re Spada),* 903 F.2d 971, 975 (3d Cir. 1990) (citing *Matter of Prescott,* 805 F.2d 719, 727 (7th Cir.1986)) (citing *In re Wadsworth Bldg. Components,* 711 F.2d 122, 124 (9th Cir.1983)). As Plaintiff acknowledges in his opening brief, the question of whether such intent exists is ordinarily a question of fact. *Id.; see also In re Ajayem Lumber Corp.,* 143 B.R. at 352. Such issues of fact cannot appropriately be resolved on a motion for summary judgment unless no genuine issue of material fact remains and only one reasonable inference can be drawn from the record with respect thereto. *See* Fed.R.Civ.P. 56(c).

Plaintiff argues that he is entitled to summary judgment with respect to Defendant's "contemporaneous exchange for new value" defense because Defendant cannot meet its burden of proving by a preponderance of the evidence that the Disputed Transfers constitute contemporaneous ex-

**9.** Federal Rule of Civil Procedure 56(c) is applicable to contested matters in bankruptcy pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7056.

**10.** "New value" is defined in § 547(a) as: money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

changes for new value pursuant to § 547(c)(1). (Pl's Br. (Doc. # 26) at 7.) In support of his argument, Plaintiff contends that: (1) nothing on the record indicates that the parties intended the Disputed Transfers to be contemporaneous exchanges for new value, or that such exchanges were, in fact, contemporaneous (*id.* at 8); (2) Mr. Saldi's testimony that he did not request the wire transfer payment and had no knowledge as to why it was made until after receipt belies any argument that he intended the wire transfer to constitute a contemporaneous exchange for new value (*id.* at 9); and (3) the Disputed Transfers cannot qualify as contemporaneous exchanges for new value as a matter of law because they were made on account of services previously rendered (*id.* at 8–9). In contrast, Defendant argues that it is entitled to summary judgment on this issue because the record establishes that Defendant gave contemporaneous new value to Debtors in the form of continued services (Def.'s Br. (Doc. # 23) at 10–12).[11] I find both of the parties' arguments to be unpersuasive.

▆ First, the current record, which is primarily comprised of the deposition testimony of Mr. Layher and Mr. Saldi, is murky as to what the parties actually intended at the time the Disputed Transfers were made. This is particularly true with respect to the January 30, 1998 wire transfer. Not only did Mr. Layher testify that he did not approve such transfer (Layher Depo. at 18), but also, any knowledge Mr. Layher had with respect to Debtors' intent in making the transfer was acquired through a "general discussion concerning wire transfers" with his immediate supervisor on February 2, 1998. (*Id.* at 17–18.) This discussion did not specifically pertain to a particular wire transfer payment made to Defendant and therefore, it is unclear what the parties intended with respect thereto. (*Id.*)[12] Second, Defendant's argument that it essentially acted as an agent/employee of Debtors, the continued services of which might be considered as "new value" given in exchange for the Disputed Transfers (*see* Def.'s Br. (Doc. # 23) at 12) raises a question as to the parties' intent with respect to Defendant's role in providing services to Debtors. Although at this point in the proceeding there appears to be little merit to Defendant's argument, a question remains as to what the parties intended with respect to Defendants' services, whether Defendant's services for Debtors rose to the level of an agent/employee and therefore, whether Defendant's continued services could constitute "new value" within the meaning of § 547(c)(1). Finally, even if it may be appropriate for the "contemporaneous exchange for new value" aspect of Defendant's defense to be decided on a motion for summary judgment, due to the fact that genuine issues of material fact remain as to whether the Disputed Transfers were made within the "ordinary course of business exception" in § 547(c)(2), *see* discus-

---

**11.** It is unclear as to whether Defendant's makes this argument vis-a-vis both Disputed Transfers, or only the January 30, 1998 wire transfer. While the bulk of Defendant's argument seems to discuss only the wire transfer as a contemporaneous exchange for new value, at one point Defendant states that it "gave new value for services including those found in the wire transfers." (*See* Def.'s Br. (Doc. # 23) at 12.) In light of this ambiguity, and because Defendant's argument applies equally to both Disputed Transfers, I will address it as such.

**12.** I am not convinced by Plaintiff's argument that Mr. Saldi's testimony that he did not request the wire transfer payment and had no knowledge as to why it was made until after receipt belies any argument that the parties intended the wire transfer to constitute a contemporaneous exchange for new value.

sion, *supra*, thereby necessitating a trial on the merits, I find it more appropriate to reserve judgment on both issues until after trial.[13]

## Ordinary Course of Business

 To prevail on an "ordinary course of business" defense under § 547(c)(2), Defendant must prove that: (1) the Disputed Transfers were made in payment of a debt incurred by Debtors in the ordinary course of business between Debtors and Defendant; (2) such Transfers were made in the ordinary course of business between Debtors and Defendant; and (3) such Transfers were made according to ordinary business terms. 11 U.S.C. § 547(c)(2). While the second prong of this test requires that the Disputed Transfers were "ordinary" in relation to Debtors' and Defendant's other business dealings, the third requires that the Disputed Transfers are "ordinary" in respect to prevailing industry standards. *E.g., Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 223–24 (3d Cir.1994); *In re Ajayem Lumber Corp.*, 143 B.R. at 353. A determination as to each of these prongs depends upon the particular facts of the case. *See, e.g., In re Kaypro*, 218 F.3d 1070, 1074 (9th Cir.2000); *Kirtley v. Consol. Nutrition, L.C. (In re Freeny)*, 187 B.R. 711, 718 (Bankr.N.D.Okla.1995); *see also In re Ajayem Lumber Corp.*, 143 B.R.

at 353. As a result, summary judgment will not be proper unless no genuine issue of material fact remains and only one reasonable inference can be drawn from the record with respect thereto. *See In re Freeny*, 187 B.R. at 718; *see also* Fed. R.Civ.P. 56(c).

Plaintiff argues that he is entitled to summary judgment because the "the undisputed facts of the record make clear" that Defendant cannot satisfy its burden of proving its § 547(c)(2) defense by a preponderance of the evidence. (Pl's Br. (Doc. # 26) at 7.) In contrast, Defendant argues that it is entitled to summary judgment because it has met its burden of proof in that: (1) the Disputed Transfers are clearly in the ordinary course of business as they constitute payments for continued services rendered under the Agreements (Def.'s Br. (Doc. # 23) at 6); (2) the Disputed Transfers were all made "within the outer limits of normal practices" (*id.* at 9.); (3) while the wire transfer payment was an exception to the procedure described in Mr. Layher's testimony, such Transfer was initiated by Debtors and did not result from Defendant's inquiries (*id.* at 7); and (4) in light of the fact that Debtors and Defendant had a "cemented relationship", the parties should be permitted "greater variation from the industry norm without leaving the safe harbor of § 547(c)(2)" (*id.* at 8–9). I find both of the parties' arguments to be unpersuasive.[14]

**13.** With respect to Defendant's argument that it is entitled to summary judgment on the § 547(c)(1) issue, I find the facts that Mr. Saldi testified that his vehicles carried a logo on them which said "Operated by APS" (Saldi Depo. at 7), and that Defendant continued to provide services to Debtors after the Disputed Transfers were made, standing alone, to be insufficient to satisfy Defendant's burden under § 547(c)(1).

**14.** Defendant also argues that the Agreements were executory in nature which, in light of

the testimony of Mr. Layher and Mr. Saldi, were clearly never rejected by Debtors. (Def.'s Br. (Doc. # 23) at 13.) "This fact," Defendant argues, "supports the view that [Debtors] intended to continue a normal business relationship with Defendant before and during the Chapter 11 proceeding and pay for services according to ordinary business terms." (*Id.*) I find this argument to be without merit. The issues of the parties' intent and whether the Agreements constitute executory contracts which Debtors rejected/assumed has no bearing on whether the Disput-

Plaintiff first argues that he is entitled to summary judgment on the § 547(c)(2) issue because the $15,306.25 check payment made 65 days after the date of invoicing and the January 30, 1998 wire transfer payment were clearly outside the parties' ordinary course of dealing.[15] I disagree. While Mr. Layher testified that it was "not typical" for an invoice to be paid more than "two months" from the invoice date (Layher Depo. at 27), he also testified that he didn't feel qualified to define a specific time frame indicating when a check was timely paid and when it wasn't (*id.* at 30). In addition, both deponents agreed that there was no established schedule according to which the invoices would be paid. (*Id.* at 13–14; Saldi Depo. at 16–17.) In fact, both deponents acknowledged that the time in which the invoices were paid varied depending on when Mr. Layher could get to them. While Mr. Layher testified that the parties' understanding was that the invoices would be paid "as quickly as possible" (Layher Depo. at 26), Mr. Saldi testified that he didn't think the parties had credit terms, but that "[i]t's a thing were I billed and expected to get paid, and that was our relationship, and I always got paid so I never questioned it." (Saldi Depo. at 15.) Mr. Saldi further testified that he did not consider payment on an invoice to be late for six to eight weeks. (Saldi Depo. at 17.) In comparison, Mr. Layher gave contradictory testimony in which he first "guessed" it would be fair to conclude that an invoice paid in excess of two weeks was late, but then "guessed" one could consider an invoice paid within one month to be timely paid. (Layher Depo. at 30.)

In light of the ambiguities created by the witnesses' testimony, and given the informal nature of the parties' payment schedule, I find that based on the current record, one could reasonably infer that a check payment made 65 days after the date of invoicing was made in the ordinary course of business between the parties; or one could reasonably infer the opposite. I also find that one could make similar reasonable inferences with respect to the wire transfer payment. The fact that neither Mr. Layher, nor Mr. Saldi could recall any other specific instance in which Debtors paid Defendant via wire transfer is not dispositive. *See In re Freeny,* 187 B.R. at 717 ("Even if the debtor's business transactions were irregular, they may be considered 'ordinary' for the purposes of § 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties."). Plaintiff acknowledges that Mr. Saldi left open the possibility that Defendant may have been paid by wire transfer on two prior occasions. (Pl.'s Br. (Doc. # 26) at 11, n. 5.) Absent contradictory evidence that no other wire transfers had been previously made, or any evidence as to the circumstances under which such transfers may have been made, I am unable to conclude that one could not reasonably infer that the January 30, 1998 wire transfer payment was not made in the ordinary course of business between the parties.[16] Be-

---

ed Transfers fit within the "ordinary course of business" exception of § 547(c)(2).

**15.** Specifically, Plaintiff contends that the record demonstrates that Debtors customarily paid Defendant pre-petition by check within a few weeks of the date of invoicing. (Pl.'s Br. (Doc. # 26) at 11.) In addition, Plaintiff states that "Mr. Layher testified—and Mr. Saldi agreed—that APS customarily paid Sal-

di within a few weeks of the date of the invoice" and "Mr. Lahyer also testified that it was unusual for an invoice to be paid more than 60 days from the invoice date." (*Id.*)

**16.** I am also not convinced by Plaintiff's arguments that: (i) the letter from Debtors to Defendant accompanying the wire transfer suggests that the transfer was made in order to bring Debtors' account current in connec-

cause I also find that one could reasonably infer that the wire transfer payment was not made in the ordinary course of business between the parties, summary judgment is not proper.[17]

■ Plaintiff next argues that he is entitled to summary judgment on the § 547(c)(2) issue because the only evidence on record as to industry standards is Mr. Layher's testimony that Debtors customarily paid their shippers by company check within ten days of the date of invoicing, and such testimony indicates that the Disputed Transfers were not "ordinary" in relation to industry standards. (Pl.'s Br. (Doc. # 26) at 12.) I find this argument to be unpersuasive. While Mr. Layher's testimony pertaining to Debtors' business relationship with their other shippers may be relevant as to the industry standards, it is not, in and of itself, determinative thereof. The industry standard must be established not only by evidence of those practices in which Debtors' engage vis-a-vis their own shippers, but also evidence of those practices in which firms generally similar to Debtors and Defendant engage. *See, e.g., In re Kaypro,* 218 F.3d at 1073–74; *In re Molded Acoustical Prods., Inc.,* 18 F.3d at 223–24. In light of the fact that the current record lacks any evidence with respect to the industry standard, I am currently unable to determine whether the Disputed Transfers "were made according to ordinary business terms." *See* 11 U.S.C. § 547(c)(2).

## Conclusion

For the reasons set forth above, the parties' cross motions (Doc. # 22, 25) for summary judgment are *denied.*

---

tion with the end of its fiscal year, (ii) Mr. Layher testified that Debtors did not normally "settle up" at year's end, and (iii) Mr. Layher was informed on the Petition Date that all of Debtors' contract carriers had been fully paid prior thereto to ensure Debtors' ability to continue to deliver product post-petition. (*See* Pl.'s Br. (Doc. # 26) at 11–12.)

17. I find Defendant's arguments to the contrary, *see* discussion, *supra* p. 804, to be unpersuasive. First, that fact that the Disputed Transfers were made in connection with Defendant's services under the Agreements does not, in and of itself, lead to the conclusion that such Transfers were made in the ordinary course of business. As discussed above, Defendant must demonstrate that the Disputed Transfers were "ordinary" in relation to both Debtors' and Defendant's other business dealings, and to prevailing industry standards. Second, whether the Disputed Transfers were made "within the outer limits of normal practices" is a conclusion of law to be decided by this Court. Third, whether the wire transfer payment was initiated by Debtors without inquiry from Defendant is not a sufficient basis on which this Court may conclude that such transfer was made in the ordinary course of business. Finally, whether Debtors and Defendant had a "cemented relationship" sufficient to enable the parties to exercise "greater variation from the industry norm without leaving the safe harbor of § 546(c)(2)" remains a genuine issue of material fact which must be resolved at a hearing on the merits.